Filed 12/10/25  In re N.V. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re N.V., et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E086347 |
| Plaintiff and Respondent, | (Super.Ct.No. DPRI2200037) |
| v. | OPINION |
| R.C. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Dorothy McLaughlin, Judge.  Affirmed.

Cecilia E. Rutherford, under appointment by the Court of Appeal, for Defendant and Appellant R.C.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant, N.V.

1

Minh C. Tran, County Counsel, Jamila T. Purnell, Chief Assistant County Counsel, and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

Defendant and appellant R.C. (Mother) contends the juvenile court erred by denying her modification petition (Welf. & Inst. Code, § 388[1]) to reopen reunification services with her sons, N.V. (born in June 2019; hereafter Minor N) and E.V. (born in March 2021; hereafter Minor E), who are now six and one-half years old and four and one-half years old, respectively (collectively, Minors). After earlier substantiated referrals for domestic violence, Minors again came to the attention of plaintiff and respondent Riverside County Department of Social Services (DPSS) for domestic violence more than three years ago, in March 2022. This time, Minors have been out of Mother's custody in foster care, with only supervised visitation, for more than two and one-half years, since late March 2023. Without adding any arguments of his own, given that he did not file his own modification petition or join in Mother's petition, defendant and appellant N.V., Sr. (Father), joins in Mother's appeal to the extent any error in denial of her section 388 petition would result in setting aside the juvenile court's order terminating his and Mother's parental rights at the permanent plan selection and implementation hearing (§ 366.26; hereafter .26 hearing). As we explain *post*, Mother does not meet her appellate burden to show the juvenile court erroneously denied her modification petition. We therefore affirm the court's orders denying the petition and terminating parental rights.

---

[1] All further statutory references are to the Welfare and Institutions Code.

# BACKGROUND

The latest referral, in March 2022, indicated Mother and Father resumed a longstanding, substantial history of domestic violence, including in the presence of Minors and their three older half-siblings. The referral suggested the violence endangered Minors, including one occasion in which Father allegedly slammed an infant, apparently Minor E, against a car door. It was also alleged that Father struck Mother "all of the time in front of the children." Contradicting the report in part, Mother told a social worker she had not seen Father for several months, since she briefly entered a shelter and then moved to a paternal family member's residence with the five children.

The social worker's follow-up inquiry showed the sheriff's department responded to Mother's residence not only on the date of the initial referral in March 2022, but also subsequently again in April and May 2022. Mother was the aggressor in the April incident, "throwing and breaking stuff." Father declined to press charges against Mother at that time. Father was already subject to a no-negative-contact order, which he then violated in the May 2022 incident, and for which he was arrested as the aggressor.

Mother, however, denied the impact of domestic violence on her children. She told a social worker there was no reason for law enforcement to intervene in the April and May incidents. She acknowledged Father was back in the home. She claimed her restraining order against him had expired, whereas Father in a later interview confirmed it was in place, but he was trying to have it lifted. Mother refused voluntary domestic violence services, but said she and Father were willing to participate in family therapy.

3

The social worker provided Mother with a therapist's contact information, which Mother ignored.

Mother's and Father's child welfare history included multiple prior substantiated domestic violence referrals. These included separate incidents in 2021 in which Father choked and slapped Mother, and Mother estimated about 10 previous domestic violence incidents. She nevertheless reunited with Father each time. Father had a history of alcohol abuse and had at that time recently been arrested and charged with driving under the influence (DUI) following a motor vehicle accident. Other substantiated referrals indicated Mother had previously been a victim of domestic violence in her relationship with the father of her three older children.

In August 2022, DPSS filed a dependency petition seeking juvenile court protection for all five of the children, including Minors' half-sibling sisters, who ranged in age from eight to 12 years old. As to Minors in particular, DPSS alleged Mother and Father failed to protect them (§ 300, subd. (b)(1)) from the mutual history of domestic violence altercations in the home and from Father's chronic and unresolved alcohol abuse. The juvenile court found the requisite prima facie basis to support the petition. The court adopted DPSS's recommendation for "oversight" to ensure the children's safety, ordering family maintenance services.

DPSS's reports for the ensuing jurisdiction and disposition hearing in November 2022 reflected that by late October 2022 Mother was only in the second week of her domestic violence program and had only recently enrolled in parent education classes. Social worker inquiries indicated that sometime in September 2022 Father had "

4

'just crashed their brand new car.' " Father admitted two prior DUIs before his most recent one, but minimized them because "I never had any kids in the car." Father admitted he was an alcoholic and that he did not know how to control his anger, but claimed he was in recovery. The juvenile court sustained dependency jurisdiction over the children, with continued family maintenance services. Father was already under orders by the criminal court to undertake a year-long domestic violence program and an 18-month alcohol abuse intervention. He had recently "t[aken] a plea" for the domestic violence incident with Mother and "another plea" as well, presumably for the third DUI.

In March 2023, DPSS responded to another domestic violence referral, this time after Mother slapped Father in front of one of the older children. Mother was arrested. She still had the restraining order against Father prohibiting no negative contact; he declined to seek one against her. The other children were in their bedroom during the incident. In an interview with a social worker at the jail, Mother admitted she only participated in her case plan reunification services "a couple of times," and then ceased attending. The children reported parental fights "all the time"; they often missed school because Mother slept through taking them or Father took the car. Father posted Mother's bail.

Based on this latest incident, the children entered foster care under protective custody warrants on March 30, 2023. The juvenile court upheld Minors' detention out of custody. The older children were placed with their father. Minors N and E remained together in placement with a paternal aunt, where they adjusted well to "a loving family home environment." In May 2023, the juvenile court found true amended supplemental

petition allegations that domestic violence remained a substantial risk in the children's lives, requiring the change to foster care. The supplemental petition noted Mother's recent arrest and that neither parent complied with their case plan services.

In the initial review period after Minors entered foster care, dental appointments uncovered that Minor N suffered from 17 cavities; 14 were filled and three teeth had to be pulled. He also received a referral to address his speech delay, and Minor E saw a speech therapist, too. Mother continued to reside with Father and to deny any issue in their relationship. She reenrolled in domestic violence classes. Mother and Father struggled with redirecting Minors and setting boundaries during twice-weekly visits. The juvenile court continued reunification services and set a 12-month review hearing for early April 2024.

In May 2024, after a continuance, the juvenile court held the 12-month review hearing. DPSS recommended terminating reunification services. Mother had begun to make some progress on her case plan, but it was halting and new concerns arose. Mother claimed she stopped smoking marijuana in September 2023, but then tested positive for "THC" in late November and December that year, and also missed two tests altogether. She said she separated from Father in January 2024, and filed a restraining order against him in March 2024 when he threatened to kill her. But she continued contact with him, including visiting Minors with him, where they continued to engage in conflict in Minors' presence to their detriment. On one occasion for instance, even though Mother and Father were right beside N.V., they did not stop him from jumping off a table and bruising his forehead. Mother and Father erupted in an argument, requiring the foster

caregiver to intervene and mediate. Despite suggested snack ideas and warnings about Minor E's food allergies, Mother and Father had to be supervised and redirected not to give him those snacks.

More concerning, DPSS received a report that Mother had a history of fentanyl and cocaine abuse, and that she continued to abuse fentanyl during the dependency. Mother also said she had a new boyfriend, but did not tell her therapist about him, nor did she disclose any information about him to DPSS or her case plan manager. Mother had met him in a group class at a substance abuse center; Father was also in the class with Mother and reported he did not feel Minors would be safe in the man's presence, based on what was shared in the class. Nevertheless, Mother allowed him to appear with her onscreen at a virtual children and family team meeting, causing Minors to become confused, and there was no indication Mother recognized their confusion. Mother missed two visits with Minors, which she attributed to "being out of town for work," but the foster caregiver believed Mother spent the time with the undisclosed partner. The juvenile court did not terminate reunification services as DPSS requested, instead continuing them for one more review period.

On September 30, 2024, the court terminated reunification services at the 18-month review hearing. Mother had not disclosed anything about the person she was dating; to the contrary, when the social worker inquired, Mother denied she was involved in a relationship. She also did not provide documentation for her claim that she completed individual counseling services, which proved to be untrue. She reported that

7

she completed substance abuse counseling, but missed each of the three drug tests DPSS scheduled during the review period.

Mother also remained in contact with Father, ignoring the permanent restraining order she obtained against him in the previous review period. The foster caregiver noticed scratches on Father's and Mother's arms and necks, which Father admitted were from an "altercation" with Mother when he let her borrow his car. The continuing domestic violence worried the caregiver for Minors' safety. The father of Minors' half-siblings also worried because Mother continued to have contact with Father, including Father "go[ing] to her job and leav[ing] her teddy bears and flowers." Mother around this time then said she had just moved to a new home with the boyfriend she finally acknowledged she was seeing, but she still provided no information about him.

In terminating reunification services at the 18-month review hearing, the juvenile court explained that, at bottom, its concern was "not necessarily whether the parents have certificates" showing services attendance or completion, but rather that Mother (and Father) failed to demonstrate lasting "benefit from those services." On that question, moreover, the court expressly stated it had "credibility" concerns, including regarding continuing domestic violence and Mother's sobriety. The court noted Mother's multiple missed drug tests, and that domestic violence continued to be a serious problem, as reflected in Mother and Father's latest altercation. The court set a .26 hearing to consider and select a permanent plan for Minors. The court also reduced Mother's (and Father's) visitation to two times a month for one hour, still supervised.

In January 2025, the court continued the .26 hearing for DPSS to complete its adoption assessment. In early March 2025, Mother filed her modification petition seeking a new period of reunification services for her "to work toward family maintenance." Among other asserted changes on which Mother based her petition, Mother indicated she was "now in sober living and required to test every two weeks." Her petition said nothing about domestic violence. The juvenile court set an evidentiary hearing for April 2025 to consider the petition.

Meanwhile, DPSS's adoption assessment report indicated that Minor N, then almost six years old, and Minor E, who just turned four, were adoptable and that their foster caregivers were committed to providing them a stable, loving, and permanent home. Minors had resided with the caretakers, whom they called "Mom" and "Dad," since they entered foster care two years earlier, in March 2023. Minors became "an integral part of the[] family," had bonded with the caregivers as prospective adoptive parents, and there was clear affection among the family members. The caretakers previously raised another family member's children and felt "fortunate" and "privileged" to have Minors in their home, "to ensure they grow up together and with family."

The hearing on Mother's modification petition was continued to May 2025. The social worker met with Mother in advance of the hearing, during a supervised visit. Minors did not appear to pay Mother much attention, which corresponded to reports from other visits, which Minors enjoyed, but neither asked for Mother (or Father) during the week outside of visits. DPSS recommended denying Mother's petition. Mother continued to hide her relationship with the person she met in Alcoholics Anonymous,

though the relationship was evident in social media posts.  Without forthright disclosure, social workers had little information about the boyfriend, except that DPSS received information that he had substance abuse and criminal histories.  DPSS acknowledged that Mother was "working on her sobriety" but noted that she waited until two months after the court terminated her reunification window to enter her treatment program.  Mother was in the process of enrolling in an outpatient sobriety program.  She did not disclose any employment or stable living arrangements to provide Minors with consistent, reliable care.

In May 2025, Mother testified at the combined section 388 and .26 hearing.  She had first completed a three-month substance abuse treatment program in 2023.  She implicitly acknowledged she relapsed by identifying her most recent sobriety date in late November 2024, just before she entered a new three-month residential treatment program.  That program ended two months earlier, in March 2025.  The program included a relapse prevention class, and Mother was now enrolled in an outpatient treatment program.  Mother did not identify any recent classes or programs addressing her history of relationships involving domestic violence as a perpetrator or victim, except that she recently completed an anger management class in March 2025.  Mother acknowledged domestic violence was a concern, given she "believe[s] the whole case started only because of domestic violence."

Mother had met her boyfriend in a recovery program in October 2023, but described the relationship as "just friends" then because sober living principles discourage patients from dating.  She claimed, however, to have learned in her

coursework to identify red flags in relationships. She described her boyfriend as being a former drug user, but stated he was now sober. She acknowledged he had a criminal history, which she testified that, although it was drug-related, she said it was more than 10 years in the past. She was now living with the boyfriend; she admitted she had not told her dependency case plan manager anything about him. She blamed the social worker for "barely even speak[ing] to me." Mother was looking for work. Her driver's license was suspended. She hoped to find employment in order to upgrade to a two-bedroom apartment.

Mother described Minors as being "happy to see [her]" at visits, running up to her. They called her "Mom" at the visits and referred to the foster caregiver as "Tia" ("aunt" in Spanish). Mother conceded she never had overnight or weekend visits or visits that were unsupervised. She testified she had "no idea" why, except, "I think that they just say that I didn't benefit from my classes."

Father conceded he engaged in domestic violence with Mother. He was presently in a relationship with someone else. He requested that the court find the parental beneficial relationship exception to termination of parental rights applied. (§ 366.26, subd. (c)(1)(B)(i).)

The court denied Mother's modification petition and, finding Minors to be adoptable, selected adoption as their likely permanent plan and terminated parental rights.

In denying Mother's petition, the court explained that it "went back and reviewed the case," noting that Minors entered "out-of-custody detention" more than two years earlier because of repeated domestic violence at home, including by Mother. The court

found Mother's engagement with services initially marked by a dismissive attitude that "everything was frustrating and annoying that she had to go through the process and . . . to complete the [case] plan." The court saw in the record some change at the 18-month review when reunification efforts were terminated, but found Mother's efforts in the next six months after that date showed only changing circumstances rather than sustained, changed circumstances. The court noted in particular that "the case started out as a domestic violence case" but, while Mother had begun to take "necessary steps to address [her] substance abuse issues," she ignored establishing she was with a safe partner or that she could behave safely with that person if she brought Minors into the home. The court found Mother was not "ready to have reunification services where [she] is still—we have no information regarding her significant other." Even assuming that it were to find a change in circumstances, the court concluded granting Mother's petition was not in Minor's best interests. Mother now appeals.

## DISCUSSION

Mother contends the juvenile court erred in denying her modification petition. The court did not err.

The principles governing Mother's petition are well-settled. "Section 388 allows an interested person to petition the juvenile court for a hearing to change, modify or set aside a previous order if the petitioner can establish changed circumstances and that the proposed order would be in the best interests of the child. The burden of proof is on the petitioner." (*In re Cliffton B*. (2000) 81 Cal.App.4th 415, 423.) " '[C]hanged circumstances' " means that the problems leading to the dependency have been resolved

12

or eliminated. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 592.) "To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)

The juvenile court's decision concerning a section 388 petition "will not be disturbed on appeal in the absence of a clear abuse of discretion." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) An abuse of discretion occurs when the juvenile court has exceeded the bounds of reason by making an arbitrary, capricious or patently absurd determination. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) Witness credibility and resolving conflicts in the evidence are the sole province of the trier of fact; on appeal, we must view the evidence in the light most favorable to the juvenile court's ruling. (E.g., *In re I.J.* (2013) 56 Cal.4th 766, 773.)

Mother contends she established changed circumstances by "complet[ing] her separation from the children's father," claiming she "therefore resolved the domestic violence situation that brought the children into the dependency system." Relying on *In re Ma.V.* (2021) 64 Cal.App.5th 11 (*Ma.V.*), Mother argues that if a domestic violence victim "manages to distance herself from an abuser, the history of domestic violence should not be a continuing basis to remove the children." She restates her position that, in summary, "by ending her relationship with [F]ather," she "ameliorat[ed] the domestic violence problem [resulting in] the dependency."

Mother's argument fails in two respects. First, it overlooks that Mother was the aggressor in multiple instances of domestic violence. *Ma.V.* is thus inapt where the mother there was solely "a victim of domestic violence." (*Ma.V.*, *supra*, 64 Cal.App.5th

13

at p. 20.) *In re I.B.* (2020) 53 Cal.App.5th 133 (*I.B.*), which Mother also cites, is similarly inapposite because, while the mother there lashed out at the father on one occasion, contributing to domestic violence concerns, "[a]s the case progressed, the true story about the unequal balance of power between the couple was revealed." (*Id.* at p. 157.) The father there "used jealous rages to isolate [the mother], physical abuse to anger her, verbal abuse to harm her self-esteem and independence, and taunts to knowingly trigger a physical reaction. There was also evidence suggesting [the father] exerted financial control over Mother's disability payments." (*Ibid.*) The mother in *I.B.* convincingly demonstrated to the juvenile court that she was able to "[u]ntangl[e] herself from this high level of manipulation and control," "an enormous task." (*Ibid.*) In contrast, the record here indicates Mother was equally an aggressor in mutual instances of combat with Father. As in *I.B.*, we must view the record in the light most favorable to the juvenile court's ruling. Mother does not meet her appellate burden to establish a clear abuse of discretion in the juvenile court's conclusion that she did not redress domestic violence concerns simply because Father was no longer her romantic partner.

Second, and related, *Ma.V.* and *I.B.* are both distinguishable in another important way: the abused parents in both cases demonstrated there was no cause for concern from a new partner in their child's life or the return of a former partner. In *Ma.V.*, the mother suffered from posttraumatic stress disorder from her military service, as did a then-current companion, who in the domestic violence incident triggering the dependency there, "pinned [the mother] on the ground" in front of her daughter after an argument in their vehicle, and then "put [the mother] in a headlock, and choked her." (*Ma.V.*, *supra*,

14

64 Cal.App.5th at pp. 13, 15.) In contrast, the child's father remained in the mother and child's lives, and while he and the mother had a " 'a history of yelling,' " the juvenile court there expressly found there was no concern for domestic violence arising from the father's continued presence. (*Id.* at p. 20.)

In *I.B.*, the mother's therapist corroborated that the mother "resolved to keep away from [the abusive father]," " 'rekindled healthy relationships with old friends from high school [who became] a support system for her,' " and the mother was "not in a relationship with anyone." (*I.B.*, *supra*, 53 Cal.App.5th at pp. 142-143.) We by no means suggest that foreswearing a new relationship is a necessary prerequisite to demonstrate changed circumstances; to the contrary, as the *I.B.* court observed: "When evaluating the complexity of domestic violence relationships, not every case will be the same." (*Id.* at p. 156.)

Here, Mother's suspect credibility and ongoing *hiding* of her lengthy, surreptitious relationship with her boyfriend reasonably troubled the juvenile court. Mother claimed she had learned to identify "red flags" in relationships, but she entered her new pairing with a fellow drug abuser despite express recovery program guidance not to do so. It was clear also that she chose to be dependent on a new boyfriend with that past to provide a one-bedroom apartment on which her current hopes to reunify with Minors depended, and she depended on him for rides to and from visits because her license was suspended. She also was reliant on him to support her while she was unemployed—yet she provided no information to DPSS regarding the man, who she eventually acknowledged on the date of the hearing not only had a drug history but a criminal history as well. It was

Mother's burden to demonstrate that reopening a new window of reunification services that would necessarily involve the boyfriend was warranted; the juvenile court reasonably concluded she failed to do so.

Additionally, the juvenile court's best-interests finding independently supports the court's denial of Mother's modification petition.

Once the juvenile court "has . . . terminated reunification services and set the matter for a section 366.26 hearing, the focus of the case shifts from the parents' interest in the care, custody, and companionship of the child to the needs of the child for permanency and stability." (*In re N.F.* (2021) 68 Cal.App.5th 112, 121.) "[A] parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

Mother's petition did not address the children's need for permanency and stability, stressing instead that she "stayed connected with her children," "consistently visits and stays in touch," and that she had "a strong bond with the children," asserting also that they "are attached to [her]." While Mother's visits with Minors were consistent and pleasant, they did not ask for her between visits. Instead, they looked to their longtime caregiver for stability and, as far as Minors understood, permanency. As the juvenile court observed in denying Mother's petition, "even if I do [find] a change in circumstances, . . . for the last 24, 25 months, the children have had complete consistency. The same person comes home. No issues. They go to therapy. They get their services.

16

They have their visits.  And that's been the paternal aunt.  [¶] . . .  [S]he [and her husband are] taking care of the children, and have provided them the stability that they needed."

" 'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role.  That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.' " (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)  Under the abuse of discretion standard, the reviewing court cannot interfere unless " 'we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order.' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)  Mother shows no such error.

## DISPOSITION

The juvenile court's orders denying Mother's section 388 modification petition and terminating parental rights are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

McKINSTER

Acting P. J.

RAPHAEL

J.

17